UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY, et al.,<br><br>Defendants. | Case No. 20-cv-04468-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Docket Nos. 76-78, 80 |

## I.     INTRODUCTION

This is an insurance coverage action wherein plaintiff San Francisco Bay Area Rapid Transit District ("BART") is seeking coverage for a workers' compensation claim filed by BART employee Michael Gonsolin. Gonsolin was hired as a BART police officer in 1979, and retired in 2005. In 2006, he was diagnosed with myeloma, which he alleged arose from the course of his employment with BART. Gonsolin filed a claim with the Worker's Compensation Appeals Board ("WCAB") which was settled in December 2007.

As part of the settlement, BART and Gonsolin stipulated to a date of injury from November 1, 1990 – October 31, 1991. Based on the stipulated date of injury, BART tendered the claim to its excess carrier, General Reinsurance Company ("Gen Re."). A subsequent dispute arose in which Gen Re argued it was not bound by the injury date to which BART stipulated and had no obligation to cover the claim; the action resolved in favor of Gen Re. *See BART v. General Reinsurance*, Case No. 3:14-cv-01866 (N.D. Cal.).

Thereafter, BART filed this suit against Midwest Employers Casualty Company

("Midwest"), National Union Fire Insurance Company ("National"), and Westport Insurance Company ("Westport" or "Employers Re") (collectively, "Defendants"). Defendants insured SF BART as excess carriers for losses exceeding BART's self-insured retention for different time periods between July 1, 1992, and July 1, 2006. BART brings this action to determine coverage for Gonsolin's settlement under one or more of Defendants' excess insurance policies.

Currently pending are the parties' cross-motions for summary judgment as to threshold legal issues. Docket Nos. 76 ("Midwest MSJ"), 77 ("Nat. Union MSJ"), 78 ("BART MSJ"), 80 ("Westport MSJ"). For the following reasons, the Court **GRANTS** Defendants' motions for summary judgment, **DENIES** Plaintiff's motion for summary judgment, and enters judgment for Defendants.

## II.     BACKGROUND

A.     Joint Stipulated Facts

The parties jointly stipulated to facts and supporting evidence relevant to the pending cross-motions for summary judgment. Docket No. 74 ("Facts"). The parties' enumerated stipulated facts are reproduced below:

1. Michael Gonsolin ("Gonsolin") was employed with BART as a police officer from 1979 to September 11, 2005. From 1998 through 2005, Gonsolin was a K-9 officer for BART.

2. Gonsolin retired from BART on September 11, 2005.

3. Gonsolin was diagnosed with multiple myeloma on October 13, 2006.

4. On November 20, 2006, Gonsolin served an "Application for Adjudication of Claim" in the California Workers Compensation Appeals Board ("WCAB") stating in part that while he was employed at BART as a police officer he sustained multiple myeloma, and also that "the injury occurred as follows": "Cumulative exposure to carcinogens."

5. Athens Administrators ("Athens") was, at all relevant times, the workers' compensation claims administrator for BART.

6. On January 29, 2007, Athens denied Gonsolin's Application for Adjudication of

Claim.

7.     On November 7, 2007, the First District Court of Appeal denied BART's Petition for Writ of Review in in *Ennis v. BART*, 72 Cal. Comp. Cases 1694, after noting that the WCAB decided in the underlying matter that Ennis's "employment with BART Police Department was employment by the district as a police officer at the time of his injury, entitling him to the cancer presumption."  The WCAB noted that "it was found on the facts that applicant as a BART policeman, was a police officer within the meaning of the Labor Code, carried a weapon, and had duties of enforcing the law in public places."  The WCAB further noted that "Labor Code section 3212.1(a) provides in part that 'this section also applies to peace officers, as defined in section 830.1 … of the Penal Code, who are primarily engaged in active law enforcement activities'" was entitled to the Labor Code §3212.1 cancer presumption in his action against BART.  As set forth in the November 7, 2007 Order, "it was undisputed that Applicant was exposed to known carcinogens and developed cancer and that there was no evidence to rebut the Labor Code §3212.1 cancer presumption."  The Order was silent as to whether the Labor Code §3212.1 cancer presumption applied to an action brought by BART rather than the employee.

8.     On November 26, 2007, BART's defense counsel in the Gonsolin case, Stephen Turk, reported the Ennis decision to Athens.

9.     On December 4, 2007, Turk sent an e-mail to Jesse Alcantara at BART stating in part "BART's general counsel, Tom Lee, felt that it would be prudent to attempt settlement of this case rather than try the case on 12-14-07."  The e-mail stated in further part: "Our plan of action is as follows:  1. Stipulate to AOE/COE without admitting that the presumption of injury applies; 2. Obtain a supplemental report from [WCAB Agreed Medical Examiner] AME Dr. Cayton addressing the issue of date of injury. . . . Lastly, once we know what the date of injury is, we can determine which excess carrier should be put on notice of the claim. I will be

speaking with applicant's attorney tomorrow to firm up a settlement." The subject email also stated in part: "Please recall we discussed [the] fact that the applicant's cancer was not the result of a specific injury. Rather it was the result of a cumulative exposure/ injury. As such, the date of injury would be determined based on the latency for development of that type of cancer he contracted. It appears that the latency could be 10 years. Hence, the date of injury would be 10 years prior to the date of diagnosis of the cancer. However, the latency will need to be determined by Dr. Cayton."

10.    On December 6, 2007, Dr. Cayton issued a letter advising Athens and BART in part that "[t[he latency period for Mr. Gonsolin's myeloma is fifteen years. Therefore, looking back from the date of diagnoses in 2006, exposures prior to 1991 were injurious."

11.    On December 14, 2007, BART and Gonsolin reached an agreement. The proposed terms were presented to WCAB Judge Jacqueline C. Duncan, who signed a Partial Order Approving Compromise and Release (with open medical award) on the same date. The Partial Order stated in part that "Defendant does not concede that the cancer presumption pursuant to LC 3212.1 is applicable or was in any way determinative of Defendant's acceptance of injury." The Partial Order attached the handwritten agreement between Gonsolin, BART and Athens, which included the following statement: " . . . based upon new medical information contained within Dr. Cayton's AME report of 12/6/07, parties stipulate to a date of injury of: CT [Cumulative Trauma] 11/1/90 – 10/31/91, pursuant to LC 5500.5."

12.    The Minutes [of the December 14, 2007 hearing] include the following statement: "The applicant sustained cumulative injury described as multiple myeloma/ cancer over a period of time determined by the medical expert herein, Revels M. Cayton, M. D., who served in the capacity of Agreed Medical Examiner. . . . based upon the recent medical information set forth by Dr. Cayton, the AME, in his December 6, 2007 report, the parties now stipulate to a date of injury described as a cumulative

trauma from November 1, 1990 through October 31, 1991 pursuant to Labor Code section 5500.5.  Given the complexity of the issues herein, I have independently reviewed the medical record in this file to determine whether the settlement is adequate and whether or not the date of injury is as stipulated above.  Having considered the reports of Dr. Cayton, I find that the latency period for Mr. Gonsolin's myeloma is 15 years.  Therefore, looking back from the date of diagnosis in 2006, I am persuaded that Dr. Cayton is correct in setting forth the exposures prior to 1991 as being injurious causing the injury herein."

13. The December 14, 2007 agreement, and resulting Order, did not involve Loss under the National Union, Employers Re, or Midwest policies at issue.

14. General Reinsurance Corporation ("Genesis" or "Gen Re") issued Policy No. X-6722 to BART effective July 1, 1985 to July 1,1992.

15. On December 21, 2007, Athens provided Gen Re with an "Initial report" of Gonsolin's claim.  The Initial report gave the date of injury as October 31, 1991.  It advised that "[t]his claim was initially denied and now has been accepted based on Dr. Cayton's (AME) findings."  It stated that "[Gonsolin] is not expected to survive."

16. The date of injury encompassed by the Compromise and Release approved by Judge Duncan, and stipulated to by BART and Gonsolin, was November 1, 1990 to October 31, 1991; BART had a Self-Insured Retention ("SIR") at this time under the Genesis policy of $500,000.

17. BART's payments for medical expenses incurred by Gonsolin were authorized by Genesis up until January 27, 2012; BART did not request authority for these payments from National Union, Employers Re, or Midwest.

18. Genesis reimbursed BART $192,535.02 on October 21, 2009; $64,422.97 on December 14, 2010; and $70,112.11 on November 29, 2011. The three payments by Genesis to BART totaled $327,070.10.

19. On January 27, 2012, Genesis sent a letter via e-mail and US Mail to Athens and

United States District Court
Northern District of California

BART, which stated in part that Genesis "has determined that it has no obligation under the Policy with respect to the Gonsolin Claim."

20.     Dr. Cayton passed away on August 13, 2014.

21.     BART filed a Complaint against Gen Re for Breach of Contract; Breach of Covenant of Good Faith and Fair Dealing; and Declaratory Relief, Case No.: RG 14711423, in Alameda County Superior Court, on January 24, 2014. ("BART 1").

22.     Gen Re filed a Notice of Removal of BART 1 to the United States District Court, Northern District of California, Case No.: 4:14-cv-01866, on April 23, 2014.

23.     True and correct copies of Stipulation of Issues, Evidence and Trial and Stipulated Facts were submitted on March 19, 2015 for presentation to Magistrate Judge Jacqueline Scott Corey.

24.     Magistrate Judge Corley issued her "Opinion Re: Phase One Bench Trial" on June 24, 2015, concluding that the Federal District Court had jurisdiction to make a factual finding about the date of injury, and that Gen Re "was not bound by the date of injury that the WC Appeals Board found."  Thus, the matter was to proceed to Phase Two, in which the parties would litigate the date of injury, including the exchange of medical expert reports.

25.     On July 17, 2015, counsel for BART sent a letter to the "Excess Workers Compensation Claims Department" at National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), Westport Insurance Corporation ("Westport")/Employers Reinsurance Corporation ("Employers Re"), and Midwest. This was the first notice of loss to National Union and Westport/Employers Re. The letter advised that on June 24, 2015, the Hon. Magistrate Judge Jacqueline Scott Corley concluded that the United States District Court had subject matter jurisdiction over the case and that General Re could litigate the date of injury established by WCAB Judge Jacqueline Duncan on December 14, 2007.  The letter also advised that the date of injury established by Judge Duncan's Partial Order Approving Compromise and Release with Open Medical Award was "CT 11/1/90 –

United States District Court
Northern District of California

10/31/91, pursuant to LC 5500.5," a date to which the parties stipulated following an opinion received from AME Dr. Cayton. The letter advised that Judge Duncan independently reviewed the medical record to determine whether the date of injury was as stipulated, and she concluded that it was.  The letter then stated: "we are putting you on notice of this claim, so that you can take whatever action you feel is necessary to protect your interests."

26. National Union issued reservations of rights letters ("RORs") to BART on October 13, 2015 and January 28, 2016.

27. On December 30, 2015, and on January 22, 2016, counsel for Midwest sent an acknowledgment letter / coverage position letter to counsel for BART.

28. Counsel for Midwest attended the MSC along with counsel for BART and counsel for Gen Re.

29. BART stipulated to a judgment against it following the June 24, 2015 Phase One Bench Trial Opinion on February 12, 2016. The Judgment was entered on February 12, 2016. In the Judgment, BART stipulated as follows: "BART reserves the right and intends to appeal from the judgment on the ground that the Court's decision in Phase One was in error and that this case should not proceed to Phase Two. Subject to its right to appeal the Phase One decision, BART agrees that if the case proceeded to Phase Two, the Court would find based on the testimony of the experts designated by the parties pursuant to Fed. R. Civ. P. 26 that the date of injury does not fall within GRC's policy period."

30. On March 10, 2016, BART appealed the Judgment to the Ninth Circuit Court of Appeals.

31. On March 6, 2018, the Ninth Circuit issued its opinion affirming the district court ruling that Gen Re was not bound by the date of injury determined by the WCAB.

32. On January 17, 2020, BART filed a Complaint for Breach of Contract and Declaratory Relief, Case No.: RG 20050855, in Alameda County Superior Court, against National Union, Westport/Employers Re, and Midwest ("BART 2").

33.     On July 6, 2020, Midwest filed a Notice of Removal of BART 2 to the United States District Court, Northern District of California, Case No.: 3:20-cv-04468.

Paragraphs 34-47 of the joint stipulated facts authenticate supporting evidence, including copies of Defendants' respective insurance policies.  National Union provided excess insurance coverage to BART from 7/1/1992 to 7/1/2002; Employers Re from 7/1/2001 to 7/1/2002; and Midwest from 7/1/2002 to 7/8/2008.  All stipulated evidence in support of the to the stipulated facts are available as exhibits to Docket No. 74 ("Stipulated Exhibits").

48.     National Union, Employers Re, and Midwest have not made any reimbursement payments to BART since BART sent them the July 17, 2015 letter referenced above.

49.     Athens sent First Notice of Loss to Midwest on or about December 3, 2007.  This First Notice of Loss stated that the date of injury was October 13, 2006 (which was the date of Gonsolin's diagnosis, see stipulated fact #3).  It also stated that "[Gonsolin] is not expected to survive."  It advised that the amount paid to date was $12,940.81 and that reserves were set at $780,000.

50.     Midwest responded on or about December 13, 2007, thanking Athens for the timely report, assigning a claim number, stating that Midwest did not expect the claim to reach the $4 million retention, advising that it was closing the file, and asking Athens to re-notify Midwest Employers if there was any significant change in the exposure or the total incurred reached $4 million.  Otherwise, it was not necessary to send further updates.

B.     Procedural Background

BART filed this action for breach of contract and declaratory relief on January 17, 2020.  Docket No. 1-1.  Defendant Midwest timely removed the action to federal court on July 6, 2020.  Docket No. 1.  Defendants' respective motions to dismiss were denied on November 19, 2020.  Docket No. 40.

The Court approved the parties' stipulation to consider three issues on summary judgment at this juncture in the litigation.  Docket No. 69.  Those issues are:

1.     Consent Provisions, Pre-Tender Fee and Notice Issues: Whether San Francisco Bay Area Rapid Transit District is entitled to pre-tender and/or post-tender fees of any or all insurance policies that it alleges may provide coverage, including whether these pre-tender fees and/or the entire action are barred by "voluntary settlement" provisions, "no-action" clauses, or the "Notice-Prejudice" Rule.

2.     Statute of Limitations Issue: Whether San Francisco Bay Area Rapid Transit District ("BART") claim(s) are barred by the applicable Statue of Limitations.

3.     Cancer Presumption Issue: Whether the cancer presumption found in Cal. Labor Code § 3212.1(d) applies for purposes of insurance coverage under Defendants' policies.

*Id* at 1-2.  Now pending are the parties' cross-motions for summary judgment on these issues. Docket Nos. 76, 77, 78, 80.

### III.    <u>LEGAL STANDARD</u>

A.   <u>Motion for Summary Judgment (Rule 56)</u>

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

# IV.     ANALYSIS

A.     "No Voluntary Settlements" Clauses

Defendants argue they are entitled to summary judgment because their insurance policies include clauses barring BART from entering into a voluntary settlement without the consent of the insurer, which BART failed to obtain when settling Gonsolin's claim for benefits.  *See* Nat. Union MSJ at 9; Midwest MSJ at 8-9; Westport MSJ at 6.  Plaintiff BART argues that the "no voluntary settlement" clauses are ambiguous and do not apply because BART's agreement with Gonsolin constituted a *partial* settlement that did not involve any loss to the insurers at the time that it was entered into.

For the reasons explained below, the Court concludes that Defendants are entitled to summary judgment and that Plaintiff is barred from pursuing any of its claims for coverage against Defendants.

1.     Relevant Contract Provisions

**National Union:** Between 1994 and 2001, Nation Union's policies provide:

> [W]e have the right and shall be given the opportunity by you to associate with you in the defense, investigation or settlement of any claim, suit or proceeding which might involve a loss to us. . .

> It is your responsibility to investigate, settle, defend and appeal any claim, suit or other proceeding made against you. However, **you must not make any voluntary settlement involving loss to us without our written consent**.

Stipulated Exhibits, FF at 6-7; GG at 6- 7; HH at 3, 7; II at 3,7; JJ at 3, 7; KK at 3, 7; LL at 5, 8 (emphasis added).  The policies also included a "no action" clause that states:

> There will be no right of action against us under this insurance unless you have complied with all the terms of this policy.

*Id.*  National Union's policies covering 1992-1994 provided that the company's "limit of liability shall be only for the ultimate net loss" where "Ultimate Net Loss" is defined as

> [T]he sum actually paid in the settlement or satisfaction of losses for which the insurer is liable, either by adjudication or **compromise with the written consent of [National Union]**

*Id.*, DD at 5, 8; EE; 6, 10 (emphasis added).

United States District Court
Northern District of California

**Westport:** Westport's policy (as Employers Re), covering 2001-2002, provides:

> A. Your Claims Handling Duties. It is your responsibility to investigate, settle, defend and appeal any claim made against you. It is also your responsibility to investigate, settle, defend and appeal any suit brought or other proceeding instituted against you.
>
> B. Your Claims Reporting Duties. You must give us written notice as soon as you learn of:
>
> > 1. any of the following events involving loss which exceeds (or might in the future exceed) 50% of your retention: (a) claim; (b) award; (c) verdict; (d) action; (e) suit; (f) proceeding; (g) judgment [.] . .
>
> D. Claims Participation By Us. At our own election and expense, **we have the right to participate with you in the settlement, defense or appeal of any claim, suit or proceeding which might involve a loss to us.**
>
> E. Settlements. **You agree not to make any voluntary settlement involving loss to us without our written consent.**

Stipulated Exhibits, MM at 1 (emphasis added).[1]

**Midwest**: Midwest's policy, covering 2002 to 2006, provides:

> A. Your Claims Handling Duties. It is your responsibility to investigate, settle, defend and appeal any claim made against you. It is also your responsibility to investigate, settle, defend and appeal any suit brought or other proceeding instituted against you. . .
>
> D. Claims Participation By Us. At our own election and expense, **we have the right to participate with you in the settlement, defense or appeal of any claim, suit or proceeding which might involve a loss to us.** We have no duty to investigate, handle, settle or defend any claims, suits or proceedings against you.
>
> E. Good Faith Settlements. You shall use diligence, prudence, and good faith in the investigation, defense and settlement of all claims and shall not unreasonably refuse to settle any claim which, in the exercise of sound judgment, should be settled. **You agree not to make any voluntary settlement involving loss to us without our written consent.**

Stipulated Exhibits, NN at 22 (emphasis added).

---

[1] The quoted language is included in a policy form referred to and incorporated into the Employers Re policy.  Although the policy form does not appear on its own as a Stipulated Exhibit, the parties do not dispute the accuracy of the quoted language.  *See* Westport MSJ at 3-4; BART MSJ at 14; Docket No. 83 ("BART Opp. to Westport") at 2-3.

United States District Court
Northern District of California

2.      Analysis of No "Voluntary Settlement" Clauses

The parties stipulated to the fact that "BART and Gonsolin reached an agreement," which was approved in a "Partial Order Approving Compromise and Release [with open medical award]" by WCAB Judge Duncan.  Facts ¶¶ 11-12; Stipulated Exhibits, G ("Settlement") at 1 ("The parties to the above-entitled action filed a Compromise and Release Agreement. . . settling this matter as specified in the agreement. . . I conclude that the settlement amount is adequate and that the Compromise and Release should be approved.").  Under the settlement, BART agreed to pay Mr. Gonsolin $200,000 and to "pay all medical care that is reasonable and necessary to cure or relieve the effects of the industrial injury."  Settlement at 3, 5.  Nothing in the stipulated facts indicates that any Defendants were notified of the agreement prior to its confirmation.  Nor are there any facts establishing that any Defendants provided written consent for BART to enter into the agreement.

Defendants contend they are entitled to summary judgment because BART is precluded from pursuing recovery for the losses from the settlement due to BART's decision to settle Gonsolin's underlying claim for workers' compensation without their consent – in violation of the no "voluntary settlement" clauses of the respective policies.  Notably, "California law enforces such no-voluntary-payments provisions in the absence of economic necessity, insurer breach, or other extraordinary circumstances.  They are designed to ensure that responsible insurers that promptly accept a defense tendered by their insureds thereby gain control over the defense and settlement of the claim."  *Jamestown Builders, Inc. v. Gen. Star Indem. Co.*, 77 Cal. App. 4th 341, 346 (1999) (citations omitted).  *See Faust v. Travelers*, 55 F.3d 471, 472 (9th Cir. 1995) ("California courts have consistently honored [no-]voluntary payment provisions"); *Haskins v. Emps. Ins. of Wausau*, 710 F. App'x 755, 757 (9th Cir. 2018) ("The policies contained a no-voluntary-payments clause that prohibited the insured from 'voluntarily mak[ing] any payment' or 'assum[ing] any obligation.' . . . Summary judgment on this claim was proper.").

BART makes five arguments to avoid the conclusion that it is barred from seeking recovery against Defendants due to its failure to obtain Defendants' consent before settling Gonsolin's claim.  None are persuasive.

12

United States District Court
Northern District of California

First, BART argues that its agreement with Gonsolin is not covered by the language of Defendants' policies. BART MSJ at 14-15. Specifically, BART observes that each policy requires the insurer's consent *only* for "any voluntary settlement involving loss to [Defendant]," Stipulated Exhibits, FF at 7; MM at 1; NN at 22. BART points to stipulated fact 13, which states, "The December 14, 2007 agreement, and resulting Order, did not involve Loss under the National Union, Employers Re, or Midwest policies at issue." Facts ¶ 13. BART, thus, asserts that because the agreement did not involve loss to Defendants at the time it was entered into on December 14, 2007, Defendants' policies requiring consent to "any voluntary settlement *involving loss* to [Defendant]" do not apply.

This is wrong. There is no dispute that the settlement with Gonsolin will require payments in excess of the appliable SIRs for each policy given the open medical claims and the extensive medical treatment the cost of which BART is responsible under the settlement. Indeed, BART clearly accepts the premise that its agreement with Gonsolin involves losses to Defendants – as it must in order to obtain recovery from Defendants through this action. BART provides no authority or basis for the Court to read the no-voluntary-settlement to apply *only if* a settlement agreement involves loss to the Defendant *on the date that it was entered into* when the agreement further requires future payments. Further, BART's argument conflicts with the contractual rights of Defendants "to participate with [BART] in the settlement, defense or appeal of any claim, suit or proceeding which *might* involve a loss to [Defendant]." Stipulated Exhibits, FF at 7; MM at 1; NN at 22.

Second, BART contends that the terms "voluntary" and "settlement" are ambiguous and undefined in the relevant policies, and such ambiguities must be construed *against the insurer* under California law. BART MSJ at 15. From there, BART argues that its agreement with Gonsolin does not constitute a "voluntary settlement" because "BART partially settled the claim within the [retention amount], leaving medical expenses not settled" and "it was speculative whether future payments would have exceeded the [retention amount] at the time of the settlement." *Id.* It follows, BART concludes, that the losses for which BART seeks coverage from Defendants do not flow from a "voluntary settlement." *Id.* BART crystallizes its position:

1  "Had Gonsolin passed away, the [retention amount] would never have been exhausted" and,

2  therefore, BART would not have had to seek coverage from Defendants.  *Id.* at 16.

3          Again, this argument lacks merit.  BART fails to identify any ambiguity in the plain

4  meaning of the terms "voluntary settlement," any ambiguity in their use in the contractual

5  language, or any ambiguity in the application of the "voluntary settlement" language to the facts

6  here.  *See also Bay Cities Paving & Grading v. Lawyers' Mutual*, 5 Cal. 4th 854, 866 (1993)

7  ("The absence from the policy of a definition of the term 'related' does not by itself render the

8  term ambiguous"); *Fireman's Fund Ins. Co. v. Superior Court*., 65 Cal. App. 4th 1205, 1212–13

9  (1997) (Courts "will not strain to create an ambiguity where none exists or indulge in tortured

10  constructions to divine some theoretical ambiguity in order to find coverage where none was

11  contemplated.") (Citations omitted).  Indeed, the parties' stipulated facts include the WCAB's

12  order approving BART's agreement with Gonsolin in which the agreement is referred to as

13  "settling this matter" and included a "settlement amount."  Settlement at 1.  The obligation to

14  make future payments for Gonsolin's medical treatment was part of the settlement into which

15  BART voluntarily entered.

16          Moreover, there is no basis for BART's argument that the agreement constituted a "partial

17  settlement" removing it from the scope of the no-voluntary-settlement provisions simply because

18  the precise amount that BART owed for Gonsolin's ongoing medical expenses was not a sum

19  certain as of the date the agreement was approved.  The settlement agreement unequivocally

20  obligates BART to cover Gonsolin's medical expenses: "Total Unpaid Medical Expenses to be

21  Paid By. . . Defendant[;]" "the employer [BART' will pay all reasonable medical expenses

22  incurred after approval of this agreement."  *Id.* at 3; *see also id.* ("Defendant to pay all medical

23  care that is reasonable and necessary to cure or relieve the effects of the industrial injury");

24  Stipulated Exhibit, H at 3 ("The parties further stipulate that the defendant shall pay all reasonable

25  and necessary medical care to cure or relieve from the effects of the industrial injury with any

26  dispute to be resolved by the Agreed Medical Examiner, Dr. Revels Cayton.").  Nothing in the

27  terms of the Defendants' policies conditions the no-voluntary-settlement clause to the retention

28  amount that BART being first met.  The point of the clause is to permit the insurer's participation

United States District Court
Northern District of California

in a settlement that would present a risk of exposure to the insured.  *See AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 821-822 (1990) ("Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation … Such intent is to be inferred, if possible, solely from the written provisions of the contract.").

Third, BART argues that its settlement agreement with Gonsolin was not "voluntary" because "[o]ther factors made it prudent for BART to partially settle" including "the Ennis decision," "Dr. Cayton's Reporting," and "WCAB Judge Duncan's independent review."  Docket No. 83 at 3.  But these considerations are precisely the types of information that are taken into account in consideration of any settlement.  Under BART's argument, no settlement made under pressure of any litigation risk would be voluntary.  In fact, elsewhere BART effectively concedes that it chose to settle the claim.  BART MSJ at 13 ("[O]nce the Ennis decision was handed down, BART felt it was prudent to settle Gonsolin rather than try the case on 12/14/2007.").  BART also makes a passing argument that because the settlement agreement was approved by a WCAB judge, it is not a "settlement," but rather an "adjudication" – and that Defendants' policies require them to cover claims arising from adjudications.  Docket No. 84 at 3.  The fact that a voluntary settlement was presented to and approved by a judge does not transform the settlement into an adjudication.

Fourth, BART observes that Defendants' "no voluntary settlement" clauses are narrower than other "no voluntary payments" clauses that California courts have enforced to preclude claims for coverage from insurers that were made without the insurer's consent.  BART MSJ at 16-18 (citing *Jamestown Builders*, 77 Cal. App. 4th at 345 (no-voluntary-payments clause refers to "loss expenses and legal expenses"); *Faust*, 55 F.3d at 472 ("no insureds will, except at their own cost, voluntarily make a payment, assume any obligation, incur any expense, other than for first aid, without our consent."); *Dietz Int'l Pub. Adjusters of Cal., Inc. v. Evanston Ins. Co.*, 796 F. Supp. 2d 1197 (C.D. Cal. 2011) ("The Insured shall not, except at (its) own cost, make any payment, admit any liability, settle any claims, assume any obligation or incur any expense").  BART concedes that it found no cases interpreting the contract language at issue here differently from other "no-voluntary-payment" provisions.  *Id.* at 17.  And BART does not offer any logical

15

United States District Court
Northern District of California

1   reason why the difference between the contractual terms at issue here and the language cited in

2   other cases alters the enforceability or applicability of the clauses here.  BART concedes that its

3   argument is derivative of its first contention that its settlement with Gonsolin "did not involve loss

4   [to] the defendant carriers" and therefore did not trigger the consent provisions.  *Id.* at 18.

5   Therefore, this argument fails for the same reasons the first argument fails.  BART fails to

6   demonstrate that the no-voluntary-settlement language at issue here does not apply.

7        <u>Fifth</u>, BART argues that even if Defendants' no-voluntary-settlement provisions apply

8   here, the facts of this case constitute one of the extraordinary circumstances which the California

9   Court of Appeals left open as a possible exception to the applicability of a no-voluntary payment

10  provision.  BART MSJ at 18-19.  Specifically, in *Jamestown Builders*, the court noted that "an

11  insured may be able to avoid application of a no-voluntary-payments provision where the previous

12  payments were made involuntarily because of circumstances beyond its control."  77 Cal. App. 4th

13  at 348.  "This situation might occur when the insured is unaware of the identity of the insurer or

14  the contents of the policy."  *Id.*  "Or the insured may be faced with a situation requiring immediate

15  response to protect its legal interests."  *Id.*

16       To invoke this exception, BART recounts the procedural history and background to this

17  case contained in the stipulated facts, and asserts that the litigation history involving the Ninth

18  Circuit's affirmance of this District's ruling that Gen Re is not liable for payments arising from the

19  Gonsolin settlement constitutes "circumstances beyond its control" that entitle it to escape the

20  enforcement of Defendants' consent provisions.  Such circumstances are nothing like those that

21  *Jamestown Builders* alluded to when considering possible circumstances that would justify

22  foregoing enforcement of insurer's consent provisions.

23       For instance, BART contends it "did not know the identity of the carrier until Magistrate

24  Judge Corley determined that Gen Re could argue that a different date of injury applied" in

25  rendering her decision in *BART I* in 2015.  Docket No. 83 at 3.  This is not accurate.  BART knew

26  who all its insurers were.  It could and should have given notice to all of them.  Instead, it

27  stipulated with Gonsolin the date of Gonsolin's injury and assumed that would bind Gen Re to

28  coverage.  The fact that BART's strategy to put all its eggs in one basket proved erroneous is a

matter of its own making.  No exception under *Jamestown Builders* applies.

Accordingly, the Court finds that (1) Defendants' no-voluntary-settlement provisions do apply, and (2) BART failed to comply with the provisions by entering into a settlement agreement with Gonsolin without Defendants' consent.  To determine whether Defendants are entitled to summary judgment on this ground, the Court addresses BART's argument that, *even if* the consent provisions apply, Defendants still must prove that they were prejudiced by BART's failure to comply.

### 3.   Notice-Prejudice Rule

BART argues that *even if* it failed to comply with no-voluntary-settlement clauses, Defendants still must show that they were prejudiced by BART's non-compliance in order to be entitled to summary judgment.  *See* Docket No. 84 at 4-5; Docket No. 82 at 5-6.

BART relies on *Pitzer College v. Indian Harbor Ins. Co.*, in which the California Supreme Court which addressed whether the notice-prejudice applies "to a consent provision in the context of first party [insurance] coverage." 8 Cal. 5th 93, 108 (2019).  The Court reasoned that, "In a true first party context, there is no claim of liability for the insurer to defend and hence no logical need for it to retain unimpaired control over the claims handling."  *Id.*  Importantly, *Pitzer* acknowledged the distinction between the applicability of the notice-prejudice rule to consent provisions in *first party insurance policies* and *third-party insurance policies.  Pitzer* noted that, "Because the insurer's right to control the defense and settlement of claims is paramount in the third-party context, California appellate courts have generally refused to find the notice-prejudice rule applicable to consent provisions in third-party policies."  *Id.*  California courts have repeatedly enforced no-voluntary payments provision in cases involving third party claims.  *See Jamestown Builders*, 77 Cal. App. 4th at 346 ("California law enforces such no-voluntary-payments provisions in the absence of economic necessity, insurer breach, or other extraordinary circumstances."); *Insua v Scottsdale Ins. Co.*, 104 Cal.App.4th 737, 745 (2002) (same).  Therefore, whether Defendants are required to demonstrate they were prejudiced by BART's failure to comply with their consent provisions depends on whether Defendants' policies here are first-party insurance policies or third-party insurance policies.  For reasons stated below, they are

1     third party insurance policies.

2         *Pitzer* elucidated the difference between first- and third-party policies as follows:

3             Whereas first party coverage obligates the insurer to pay damages
              claimed by the insured itself, third party coverage obligates the
4             insurer to defend, settle, and pay damages claimed by a third party
              against the insured.  "[A] first party insurance policy provides
5             coverage for loss or damage sustained directly by the insured (e.g.,
              life, disability, health, fire, theft and casualty insurance).  A third-
6             party liability policy, in contrast, provides coverage for liability of
              the insured to a third party who has been injured because of the
7             insured's negligence.  Examples of such coverage are typically
              found in (but not limited to) commercial general liability policies, a
8             homeowner's liability policy, a directors and officers liability policy,
              or an errors and omissions policy.  In the usual first party policy, the
9             insurer promises to pay money to the insured upon the happening of
              an event (also known as an occurrence), the risk of which has been
10            insured against.  In the typical third-party liability policy, the carrier
              assumes a contractual duty to pay judgments the insured becomes
11            legally obligated to pay as damages because of bodily injury or
              property damage caused by the insured. . .  In third-party insurance
12            policies, then, consent provisions, sometimes called "no voluntary
              payment" provisions, "are designed to ensure that responsible
13            insurers that promptly accept a defense tendered by their insureds
              thereby gain control over the defense and settlement of the claim."

14

15    *Pitzer*, 8 Cal. 5th at 107 –108 (citations omitted).

16        Here, the policies obligate Defendants to cover "liability imposed upon [BART] by the

17    workers' compensation law" and "liability must result from bodily injury by accident or bodily

18    injury by disease sustained by an employee [BART] normally employ[s]" – *i.e.*, a third party.

19    Stipulated Exhibits, NN at 20 (Midwest policy); *see also id.* MM at 1 (Westport's policy is a

20    "Specific Excess Workers Compensation and Employers Liability Indemnity Policy); KK at 3

21    (National Union policy "applies to losses paid by [BART] as a qualified self-insurer of Employers

22    Liability for Bodily Injury by Accident or Bodily Injury by Disease.").  Specifically, in the instant

23    action, BART is seeking coverage from Defendants to cover its liability due to bodily-injury by

24    disease sustained by a *third-party*, Gonsolin.  Thus, Defendants' policies are third-party policies

25    because they "provide[] coverage for liability of [BART] to a third party who has been injured

26    because of [BART's] negligence" and "the carrier assumes a contractual duty to pay judgments

27    the insured becomes legally obligated to pay as damages because of bodily injury . . . caused by

28    the insured."  *Pitzer*, 8 Cal. 5th at 108.

United States District Court
Northern District of California

BART asserts that the policies are first-party policies, such that *Pitzer* applies, but provides no analysis or reasoning to support its assertion. *See e.g.,* Docket No. 84 at 5 ("The subject policy is a first party policy because BART pays workers compensation benefits and seeks reimbursement"); Docket No. 82 at 6 (same). There is no basis for BART's assertion. Unlike first-party policies, Defendants' policies do not obligate Defendants "to pay damages claimed by the insured itself," nor do the policies require Defendants "to pay money to the insured upon the happening of an event. . . the risk of which has been insured against." *Pitzer*, 8 Cal. 5th at 108. In short, Defendants' policies do not have the basic characteristics of first-party insurance policies.

To be sure (even though BART does not advance this argument), Defendants' policies differ from *Pitzer's* description of third-party policies: Defendants' policies do not "*obligate*[] the insurer to *defend*" and "*settle*" the "damages claimed by a third party against the insured." 8 Cal. 5th at 108 (emphases added). Defendants' policies provide them with a *right* to participate in, associate in the defense of, or settle a claim by a third party. "Because the *insurer's right* to control the defense and settlement of claims is paramount in the third-party context, California appellate courts have generally refused to find the notice-prejudice rule applicable to consent provisions in third-party policies." *Id.* The purpose of a voluntary consent provision in a third-party policy is to afford the insurers an opportunity to safeguard its interests which would be affected by the resolution of the insured's dispute with a third party. The consent clauses "mean that the insureds cannot unilaterally settle a claim before the establishment of the claim against them and the insurer's refusal to defend in a lawsuit to establish liability." *Id.* (citing *Jamestown Builders*, 77 Cal. App. 4th 346). "In short, the provision protects against coverage by fait accompli." *Id.* That purpose applies with full force here. Even though the excess insurers may not have to pay the third party directly, if there is coverage and the SIR is exceeded, they are obligated to reimburse BART for any settlement made in excess of the SIR.

Accordingly, *Pitzer* does not apply to Defendants' third-party policy consent provisions and Defendants are not obligated to demonstrate prejudice[2] in order to obtain summary judgment

---

[2] Because Defendants are not obligated to demonstrate they were prejudiced by BART's failure to comply with their no-voluntary-settlement provisions, BART's argument that its pre-settlement

United States District Court
Northern District of California

on the basis that BART violated the consent provisions of their policies.

## V.    CONCLUSION

In summary, the Court finds:

1.    Defendants' insurance policies included clauses that prohibited BART from entering into voluntary settlements involving loss to Defendants without Defendants' consent;

2.    BART entered into a voluntary settlement with Gonsolin without Defendants' consent;

3.    BART's voluntary settlement with Gonsolin now involved loss to Defendants (a premise that BART necessarily asserts in pursing this action);

4.    No special circumstances apply that bar the applicability of Defendants' no-voluntary-settlement provisions;

5.    Defendants are issuers of third-party insurance policies and are not required to prove they were prejudiced by BART's failure to comply with the consent provisions of their insurance policies; and, therefore,

6.    BART is precluded from pursuing claims for coverage against Defendants because BART failed to comply with the no-voluntary-settlement provisions of the policies.

Thus, Defendants are entitled to summary judgment on all of BART's claims.  Because granting summary judgment to Defendants on this ground disposes of all issues in the case, the Court need not address the other two issues that the parties briefed.

Accordingly, the Court **GRANTS** Defendants' motions for summary judgment.  Docket

---

notice of loss to Midwest in 2007 precludes Midwest from claiming it was prejudiced, Docket No. 82 at 5, is not relevant.  Although BART provided Midwest with a notice of loss prior to settlement of Gonsolin's claim, Facts ¶ 49; Exhibit OO, BART did not seek or obtain Midwest's consent to settle Gonsolin's claim as required by Midwest's no-voluntary-settlement provision. Indeed, BART's notice of loss to Midwest indicated that Gonsolin's claim has been *denied* and that the claim would be taken to trial.  Exhibit OO.  Nothing in BART's notice of loss suggested or put Midwest on notice that BART was planning to settle Gonsolin's claim, let alone did anything in the notice seek Midwest's written consent to enter into a settlement agreement as required by Midwest's policy.  *See id.; cf. Insua*, 104 Cal. App. 4th at 745 (rejecting the argument that "by initially denying policy coverage for reasons other than the no-voluntary-payments provision, [the insurer] became barred from asserting the no-voluntary-payments provision as a defense to indemnification.").

Nos. 76, 77, 80.  The Court **DENIES** Plaintiff's motion for summary judgment.  Docket No. 78.

This order disposes of Docket Nos. 76, 77, 78, and 80.

The Clerk of the Court is directed to enter judgment for Defendants and to close this case.

**IT IS SO ORDERED**.

Dated: December 27, 2021

_____
EDWARD M. CHEN
United States District Judge